IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RITA BLAYLOCK and            :
LONNIE BLAYLOCK,
          Plaintiffs         :

                             :
          vs.                       CIVIL NO. 1:CV-06-1456
                             :

                             :
ALLSTATE INSURANCE COMPANY,
          Defendant          :


*M E M O R A N D U M*

I.   *Introduction*

        We are considering the parties' cross-motions for
summary judgment. This is an action under Pennsylvania law for the
bad-faith handling of a claim for uninsured motorist (UM)
coverage. Plaintiffs are Rita Blaylock and Lonnie Blaylock,
husband and wife, and Defendant is Allstate Insurance Company,
Plaintiffs' automobile insurer.[1]

        Rita Blaylock was injured in an automobile accident with
another driver who had no insurance. She made a claim against
Allstate for UM coverage, which would have been in the amount of
$15,000. Allstate refused, asserting that she had signed a form
rejecting it. Blaylock disputed this, asserting that the signature
on the form was not hers, thereby entitling her under Pennsylvania

_____

        [1] Although Lonnie Blaylock is a plaintiff, our subsequent
references to the plaintiffs will only be to Rita Blaylock as the
plaintiff and in the singular.

law to UM coverage regardless of the policy provisions. At arbitration, Plaintiff won in a split decision and then filed this action in state court. Defendant removed it here, invoking our diversity jurisdiction.

In Plaintiff's motion for summary judgment, she argues that Allstate acted in bad faith because it insisted upon arbitrating the UM coverage issue when it had no reasonable basis for doing so. She mainly asserts that Allstate simply decided from the outset to deny her claim even when she presented evidence to the contrary, including a sworn statement that the signature was not hers and the opinion of a handwriting expert backing her up.

In Allstate's motion for summary judgment, it mainly argues that the bad faith claim has no merit because it did have reasonable grounds to contest the UIM claim. Those grounds included a signed rejection form, albeit only a poor microfiche copy, and the opinion of a handwriting expert rebutting that of Plaintiff's expert, if only to opine that no expert opinion could be made about the genuineness of the signature on the form, one way or the other.

Our job is not to decide whether the signature was Plaintiff's or not, only whether Allstate acted in bad faith in resisting the claim. Because Plaintiff must prove in part that Allstate lacked any reasonable ground for doing so, and must prove that part of her case by clear and convincing evidence, we will

enter summary judgment for defendant Allstate and against Plaintiff.

II.   *Standard of Review*

"Summary judgment can only be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(c). We 'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007)(quoted case omitted).

We must also apply the same evidentiary standard that would be used by the fact finder at trial. *Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 129, 137 (3d Cir. 2005)(on summary judgment, applying the clear-and-convincing standard of proof to an insurer's attempt to rescind an insurance policy and to the insured's bad faith claim); *see also Heinlein v. Progressive N. Ins. Co.*, No. 05-1769, 2007 WL 2071676, at *3 (W.D. Pa. July 17, 2007); *Employers Mut. Cas. Co. v. Loos*, 476 F. Supp. 2d 478, 491-92 (W.D. Pa. 2007); *Nat'l Recovery Agency, Inc. v. AIG Domestic Claims, Inc.*, No. 4:05-CV-0033, 2006 WL 1289545, at *10 (M.D. Pa. May 9, 2006).

An insured has to prove her bad faith claim by clear and convincing evidence. *Greene v. United Services Auto. Ass'n*, ___ A.2d ___, ___, 2007 WL 4110632, at *9 (Pa. Super. 2007). Thus, Defendant's motion must be granted if Defendant establishes that Plaintiff's evidence on summary judgment would not persuade any reasonable fact finder clearly and convincingly that Allstate had handled her UM claim in bad faith. Conversely, Plaintiff's motion must be granted if she shows clearly and convincingly that no reasonable fact finder could believe that Allstate had not acted in bad faith. *See In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003)(a party moving for summary judgment that has the burden of proof at trial must show that "'on all the essential elements of its case . . . no reasonable jury could find for the non-moving party'")(quoted case omitted).

III.  *Background*

Based on the parties' evidentiary submissions, the following is the undisputed background to the summary-judgment motions. We will sometimes borrow the parties' language without attribution.

A.  *Policy Formation and Coverage*

At her deposition, Plaintiff testified that in August 1990 (some twelve years before the accident) Plaintiff and her husband applied for the policy. She requested the same coverage as her husband had for an Allstate policy issued in Ohio. (Doc. 33,

Def.'s SMF ¶ 2; doc. 44, Pl.'s Reply.) At first, Allstate's agent quoted a price that was too high, but later came down on price, explaining, so Plaintiff testified, that he had made a mistake, that the rates were different for different areas. (Doc. 32-8, Blaylock Dep., pp. 15-17.)

Plaintiff went to the agent's office to sign an application form. (*Id.*, p. 21.) She remembers signing at least one form, but there may have been more. (Doc. 32-8, Blaylock Dep., pp. 23-24.) She concedes her signature does appear to be on the application form, dated August 13, 1990,[2] but she is not 100 percent sure. (*Id.*, pp. 24-25.) There were three other forms that appeared to have her signature on them, all required by Pennsylvania law and all of them also dated August 13, 1990. First, there was the "Rejection of Uninsured Motorist Protection" form.[3] Plaintiff denied that the signature on that form was hers. (Doc. 30-7, Pl.'s statement under oath, Ex. F, pp. 9-10). Her husband denied that it was his handwriting. (Doc. 30-8, Lonnie Blaylock's statement under oath, Ex. G, pp. 4-5). The second was an "Important Notice" form, advising Plaintiff of certain coverages available under Pennsylvania law, as pertinent here, UM coverage.[4] The form advised her that her signature indicated she

---

[2] A copy of the application form is at doc. 47-4, CM/ECF page 59.

[3] A copy of the UM coverage rejection form is at doc. 3-6, CM/ECF page 2.

[4] A copy of this form is at doc. 47-4, CM/ECF page 60.

understood the coverages available and which ones she had selected. Plaintiff testified that she did not recognize the form but that her signature was on it. (Doc. 32-8, Blaylock Dep., pp. 26-27.) The third form was a "Notice to Named Insureds," advising her that for a smaller premium she could elect a "limited tort option" form of relief under Pennsylvania law if she was injured in an auto accident.[5] Plaintiff did not remember the form, but she testified the signature opting for the limited tort option "looked like [her] handwriting." (*Id.* pp. 27-28.)

The policy as initially purchased had bodily injury coverage of $15,000 per person and $30,000 per occurrence, $5,000 for property damage per occurrence, $10,000 for medical expenses per person, and $30,000 per accident in underinsured (UIM) motorist coverage. These limits appeared on the declaration page. (Doc. 33, Def.'s SMF ¶ 7; doc. 44, Pl.'s Reply.) This coverage differed from the Ohio policy in that the new policy had (1) lower bodily injury limits, (2) lower property damage limits, (3) higher medical payment limits, (4) omitted collision coverage entirely, (5) omitted comprehensive coverage, (6) omitted UM coverage, and (7) added UIM coverage. (*Id.*, ¶ 8 and Pl.'s Reply.)

The policy became effective on August 14, 1990. About a month later, it was amended. The medical payment coverage was reduced to $5,000, and the UIM coverage was dropped. As indicated,

---

[5] A copy of this form is at doc. 32-8, CM/ECF page 3.

6

the insureds never had UM coverage, and the premiums they paid did not include UM coverage. (*Id.*, ¶ 22 and Pl.'s Reply.)

The policy was effective on a semiannual basis, so from the time the insureds purchased the policy in August 1990 until the date of the accident in January 2003, defendant Allstate sent the insureds the following documents every six months on or about August 14 and on or about February 14: (1) a cover letter saying it was time to renew; (2) a statement of premiums owed for each covered vehicle; (3) a form describing the coverages the insureds had and also specifically stating that UM coverage and UIM coverage had been rejected; (4) cards showing proof of insurance for the six-month period; and (5) a declaration page showing the coverages in force and noting that UM and UIM coverage had been rejected. When the insureds would amend their coverage occasionally, they received the same documents (Doc. 32-19 and 32-20, Def.'s Ex. I; doc. 47-7, Def.'s Ex. H.) Lonnie Blaylock admits having received these documents, (doc. 32-21, Def.'s Ex. J, Lonnie Blaylock Dep., pp. 10, 13), and Plaintiff admits having received the proof-of-insurance cards. (Doc. 32-8, Def.'s Ex. G, Rita Blaylock Dep., pp. 36-37.)

B.   *How the Claim for UM Coverage Was Resolved*

On January 3, 2003, Plaintiff was in an accident with a driver who had no insurance. (Doc. 33, Def.'s Statement of Material Facts (SMF) ¶ 23; doc. 44, Pl.'s Reply.) At some point shortly thereafter, she contacted Allstate and was told she had

only "med pay" coverage and no other coverages. (Doc. 33, Def.'s

SMF ¶ 24; doc. 44, Pl.'s Reply.)

      Plaintiff retained a lawyer. On February 14, 2003, her

lawyer advised Defendant that Plaintiff was going to pursue a UM

claim. (Doc. 33, Def.'s SMF ¶ 29; doc. 44, Pl.'s Reply; doc. 30-4,

Pl.'s Ex. C.) About two weeks later, on March 3, 2003, Allstate

replied that Plaintiff had no UM coverage. Plaintiff's lawyer then

asked Allstate to produce a signed UM rejection form.[6] Allstate

produced a copy of the form, dated August 13, 1990, the date

Plaintiff applied for the policy. (Doc. 30-6, Pl.'s Ex. E, the

rejection form.) The copy was made from a microfiche record

because Allstate had destroyed the original, apparently as a

matter of course. (Doc. 46-3, Wright Dep., pp. 37-38; doc. 30-16,

Rooney Dep., pp. 24-25.) The copy was a poor one; portions of the

signature had not transferred to the microfiche. (Doc. 47-4,

Def.'s Ex. D, report of Def.'s handwriting expert; doc. 30-9,

---

[6] Under state law, the insured's signature on such a form is
required for a valid rejection of UM coverage (and for UIM coverage
as well). *See* 75 Pa. C.S. § 1731(b) and (c.1). If a valid rejection
form is not produced, the insured is entitled to UM coverage equal to
the bodily injury liability limits of the policy, *id.*, subsection
c.1, regardless of the policy provisions and whether the insured was
not paying a premium for UM coverage. *See Am. Int'l Ins. Co. v.
Vaxmonsky*, 916 A.2d 1106 (Pa. Super. 2006)(requiring an insurer to
provide UIM coverage when the rejection form the insured signed was
not exactly identical to the language required by the statute);
*Nationwide Mut. Ins. Co. v. Merdjanian*, 195 Fed. Appx. 78, 81 (3d
Cir. 2006)(nonprecedential)("Section 1731(c.1) is essentially a
penalty default imposed upon insurers who fail to procure the proper
authorization from motorists who do not wish to purchase any UM/UIM
coverage.").

report of Pl.'s handwriting expert. p. 2; doc. 30-6, Pl.'s Ex. E, the rejection form.)

On or about April 2, 2003, Plaintiff's counsel advised Allstate that the signature on the form was not Plaintiff's and demanded that the policy be reformed to provide $15,000 in UM coverage, matching the limits of the bodily injury liability coverage in the policy. (Doc. 33, Def.'s SMF ¶ 31; doc. 44, Pl.'s Reply). At some point in April, he also demanded arbitration. (Doc. 33, Def.'s SMF ¶ 33; doc. 44, Pl.'s Reply.) As a result, in May 2003, Defendant retained M. Gerard Bradley, Esq. (Doc. 45-24, Pl.'s Ex. V; doc. 33, Def.'s SMF ¶ 33; doc. 44, Pl.'s Reply.) Bradley was retained to investigate the claim, which generally would have included taking the statement of the insured under oath and advising Allstate on steps to take about the claim. (Doc. 33, Def.'s SMF ¶ 34; doc. 44, Pl.'s Reply; Doc. 32-22, Rooney Dep., pp. 19-21.)[7]

By September 22, 2003, Colleen E. Rooney was the claims representative handling the claim for Allstate. On that date, she wrote a message to Robert Edwards, a claims supervisor, asking how to proceed since Plaintiff was denying she had signed the UM coverage rejection form. Edwards wrote back on the same day: "Defend on no coverage. Let a panel decide," (doc. 30-12, CM/ECF page 67), meaning an arbitration panel. On November 11, 2003, she

---

[7] Plaintiff asserts that Bradley was retained solely to litigate the arbitration and has submitted correspondence in the case as support. (Doc. 45-20, Pl.'s Ex. R.) The correspondence does not support Plaintiff's assertion.

wrote to Edwards again, and he replied, "Panel. Minimal coverage
if we lose." (*Id.*, CM/ECF page 68.)

On January 9, 2004, Bradley took the statements of the
Blaylocks under oath. Both of them denied that the signature on
the rejection form was Rita Blaylock's. (Doc. 30-7, Pl.'s Ex. F,
Rita Blaylock Dep., pp. 9-10; doc. 30-8, Pl.'s Ex. G, Lonnie
Blaylock Dep., pp. 4-5.) In March 2004, Tanya D. Wright began
handling the claim for Allstate. (Doc. 30-12, CM/ECF page 69.)

In August 2004, the Blaylocks sent Allstate the report
of their handwriting expert, Julie Edison. (Doc. 30-9, Pl.'s Ex.
H, report dated August 19, 2004.) Edison noted "the poor quality
of the photocopy" of the signature on the UM coverage rejection
form, but was still able to opine that the signature on the form
was not Rita Blaylock's. (*Id.*, p. 2).

In turn, Allstate retained its own expert, Gus R.
Lesnevich. In a report, dated October 5, 2004, Lesnevich opined
that it was "not possible to render any conclusion as to the
authenticity" of the signature. (Doc. 30-10, Pl.'s Ex. I, report
at p. 2.) He also observed that [t]he reproduction quality of this
signature is extremely poor and portions of the signature were not
reproduced during the copy process." (*Id.*, p. 1.) He also
remarked:

> If one were to attempt to reproduce (fill
> in) the missing portions of the questioned
> "Rita M. Baylock" signature, utilizing a
> genuine Rita M. Blaylock signature as a guide,
> it would appear that the questioned "Rita M.
> Blaylock" signature would, in fact, bare (sic)

>           a resemblance to a genuine Rita M. Blaylock
>           signature.

(*Id.*, p. 2.)[8]

In Allstate's view, it could have resolved the issue in court because the policy precludes arbitrators from deciding coverage issues. (Doc. 46-4, Def.'s Ex. E, the policy, CM/ECF page 43), but Edwards decided to accept arbitration because of the "relatively small amount of money" involved; it was less costly for both sides and quicker just to arbitrate the claim. (Doc. 46-5, Def.'s Ex. F, Edwards Dep., pp. 22-26).

The arbitration was held on March 10, 2005. In a split decision, the panel found for Plaintiff, with Allstate's arbitrator siding with Allstate. (Doc. 30-13, Pl.'s Ex. L; doc. 30-12, CM/ECF page 67, entry for June 4, 2003.) Allstate had agreed that if coverage was found, it would pay Plaintiff the $15,000 limit required under Pennsylvania law. It also agreed that it would pay Blaylock's passenger $6,000 for her injuries as well. Allstate did not appeal the arbitrators' decision. It paid the amounts owed. It also billed the Blaylocks the premiums for UM coverage back to January 3, 2003, the date of the accident. This lawsuit followed.

Bradley, Allstate's attorney, and Wright, the claims representative responsible for the claim at the time of the

---

[8] For this litigation, Allstate retained another handwriting expert who agreed with Lesnevich that the microfiche copy of the signature was too poor to allow any opinion as to its authenticity. (Doc. 32-22, Def.'s Ex. P.) This expert also opined that Allstate therefore had a reasonable basis for litigating the claim. (*Id.*).

arbitration, testified to their reasons for contesting Plaintiff's claim.[9] Bradley said that after taking the Blaylocks' statements, he had questions about their credibility since Plaintiff would have been receiving renewal notices for years indicating there was no UM coverage. Additionally, Plaintiff's expert had credibility problems as well since Allstate's expert said that the signature was too poor to say whether it was Plaintiff's signature. (Doc. 47-4, Def.'s Ex. C, pp. 16-17, 22-23, 54-55.)

Wright essentially echoed these reasons, saying that she relied on Allstate's expert report indicating that no expert opinion could be given about the genuineness of the signature and that Plaintiff had never had UM coverage from the inception of the policy. (Doc. 46-3, Wright Dep., pp. 37-40.) She also said that she had simply continued on with the decision that had already been made to take the case to arbitration. (Doc. 3-12, Pl.'s Ex. K, p. 13.).

In addition, Wright answered yes to a hypothetical question asking if she "would have reconsidered [her] decision to arbitrate" if Allstate's expert had said the rejection-form signature was not Rita Blaylock's. (*Id.*, p. 53.) Upon two follow-up questions, Wright would only say that Allstate would only have reconsidered its decision, not actually paid the claim, if

---

[9] Edwards, the supervisor, had retired before the arbitration. However, he did respond to a hypothetical question concerning the experts' reports, saying that if both experts had agreed it was not her signature, Allstate would have provided coverage. (Doc. 47-14, Def.'s Ex. P., p. 34.)

Allstate's expert had given such an opinion, even if the opinion had been categorical. (*Id.*, p. 53-54.)

Allstate never contacted the agent who sold Plaintiff the policy. Bradley believes the person was retired or they could not track him down. He did not pursue that lead very strongly because Plaintiff was not claiming that the agent had signed the form. (Doc. 46-3, Def.'s Ex. D, Bradley Dep., pp. 18-19.) Wright could not recall whether she had spoken to the agent or not. (*Id.*, Def.'s Ex. C, Wright Dep., p. 40.)

Rooney was deposed as well. Speaking in general about Allstate procedures, she stated that it would have paid the claim if Plaintiff had proven she was entitled to coverage. (Doc. 30-16, Pl.'s Ex. O, Rooney Dep., pp. 29-30.)

Allstate has a Special Investigations Unit (SIU) that looks at claims it considers fraudulent. Allstate uses a checklist to determine when to refer a claim to the SIU. Rita Blaylock's checklist tallied only thirty points, not enough for referral to the unit. (Doc. 50-2, Def.'s Ex. G, Rooney Dep., pp. 44-46.)

Plaintiff retained Sallyanne Donovan, a longtime insurance company executive, as her expert on bad-faith handling of an insurance claim. Donovan opined that Allstate had acted in bad faith in the following ways. First, after Allstate produced the microfiche copy of the rejection form and Plaintiff's counsel replied in April 2003 that it was not his client's signature on the form, Allstate should have conducted an investigation to

verify whether the signature was Rita Blaylock's. Instead, it did nothing and as late as October and November of 2003 was relying on Edwards's decision to go to arbitration and defend on coverage. She infers that Allstate never intended to investigate based on Edwards's notations that Allstate was gong to defend on coverage. She also concluded that Allstate could not rely on the insureds' semiannual receipt of Allstate's forms because the law is that a valid signature on the rejection form is required; if there is none, the insurer must provide UM coverage, regardless of the policy provisions.

Second, she opines that Allstate acted in bad faith after October 2004 when it had the handwriting reports of the two experts. As Donovan reads the reports, both experts agreed on the "key focus" of the case, that it could not be concluded that the signature was Blaylock's. (*Id.*, p. 3.) At this point, Donovan says Allstate should have reassessed the case, in part because the reports created an ambiguity that had to be resolved in the insured's favor under *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983). Instead, it stayed with its position to defend on coverage.

Finally, Donovan opines that Allstate had no reasonable basis to contest the claim in November 2003 when it did not begin to investigate until January 2004, with the taking of the Blaylocks' statements under oath.

In her supplemental report, dated July 23, 2007, made after the Allstate representatives involved in the claim were deposed, Donovan maintained her opinion. In fact, she wrote that the additional information she reviewed reinforced her conclusion that Allstate had acted in bad faith. She highlighted Wright's deposition, saying that it showed that Allstate would not reevaluate the claim once the decision to arbitrate was made, that Wright had orders to arbitrate and that the Blaylocks could have done nothing to change that, as exemplified by Wright's response to the hypothetical about Allstate's expert. (Doc. 30-19, Pl.'s Ex. R.)

In her supplemental report, Donovan also criticized Lesnevich for his ability to decide whether a signature was genuine in another case, *Jackson v. Allstate Ins. Co.*, 441 F. Supp. 2d 728, 732 (E.D. Pa. 2006), but not in this one, even though, as Donovan saw it, both cases presented "visually flawed" signatures. She also criticized Allstate's handwriting expert in this case, saying the expert's opinion that Allstate had not acted in bad faith was irrelevant because it was not the handwriting expert's area of expertise. (Doc. 30-19, Pl.'s Ex. R.)

Donovan was deposed. Under questioning, she admitted that Allstate did not have to accept Plaintiff's handwriting expert's opinion and that the expert's opinion was subject to a credibility attack, as was the testimony of the Blaylocks. (Doc. 32-7, Def.'s Ex. D, pp. 19-20.) She also stated that the

arbitrators could have used Allstate's expert to discredit Plaintiff's expert, based on his opinion that no conclusion could be drawn about the authenticity of the rejection-form signature. (*Id.*, p. 47.) She stated that she was not a handwriting expert and therefore could not critique the experts' reports. (*Id.*, p. 61.) She also agreed that going to arbitration is considered favorable to the insured. (*Id.*, pp. 48, 50, 51, and 75).

IV.   *Discussion*

     A.   *The Law of Bad Faith in Handling an Insurance Claim*

     Plaintiff's bad faith claim is authorized by 42 Pa. C.S. § 8371.[10] To prevail on a bad faith claim, a plaintiff must satisfy a two-prong test. First, the plaintiff must show that the insurance company "did not have a reasonable basis for denying benefits under the policy." *Greene v. United Services Auto. Ass'n*, ___ A.2d ___, ___, 2007 WL 4110632, at *9 (Pa. Super. 2007). Second, the plaintiff must show that the company "knew or recklessly disregarded its lack of a reasonable basis in denying

---

   [10] Section 8371 provides:

     In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
     (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
     (2) Award punitive damages against the insurer.
     (3) Assess court costs and attorney fees against the insurer.

the claim." *Id.* (quoted case omitted). If a company has a reasonable basis for denying a claim, that is all it needs to defeat a bad faith claim. *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004)("A reasonable basis is all that is required to defeat a claim of bad faith.")

The plaintiff must meet this burden by clear and convincing evidence. *Greene*, *supra*, 2007 WL 4110632, at *9. "The 'clear and convincing' standard requires that the plaintiff show 'that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant[ ] acted in bad faith.'" *Pilosi*, *supra*, 393 F.3d at 367 (quoted case omitted).

"Bad faith claims are fact specific and depend on the conduct of the insurer *vis à vis* the insured." *Greene*, *supra*, 2007 WL 4110632, at *9. They can extend to a company's investigative practices, *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1142 (Pa. Super. 2006), but those practices need not be flawless, and the company need only have conducted an investigation "'sufficiently thorough'" to yield a reasonable basis for its decision. *Krisa v. Equitable Life Assurance Co.*, 113 F. Supp. 2d 694, 704 (M.D. Pa. 2000)(quoted case omitted). Thus, when a company losses litigation over coverage, it does not automatically follow that the insured is entitled to compensation on a bad faith claim. *Id.; see also Alexander v. Provident Life & Accident Ins. Co.*, 2003 WL 23757578,

at *5 (M.D. Pa. 2003)("The law allows for the possibility that an insurer makes an incorrect decision.").

An insurer has the same duty toward an insured regardless of whether the insured is a first party or a third party to the policy; the insurer must act with good faith and fair dealing. *Condio*, *supra*, 899 A.2d at 1145. However, because the insured has the burden of showing that she is entitled to coverage, an insurer is not obligated to pay its insured's "claim on demand, no questions asked." *Id.* Instead, it can "take a stand and protect its interests in the normal course of litigation." *Id.* However, the obligation of good faith and fair dealing is ongoing and requires an insurer to reconsider its position if new evidence arises. *Id.*

B. *The Merits of the Summary-Judgment Motions*

We will dispose of the cross-motions for summary judgment by beginning with Defendant's. In moving for summary judgment, Allstate asserts that Plaintiff cannot satisfy the first prong of her bad faith claim because Defendant had reasonable grounds for litigating Plaintiff's UM claim in arbitration.[11] First, Plaintiff had to meet a high burden of proof; she was charging that her signature was forged, and under Pennsylvania law she had to show forgery by clear and convincing evidence. *See Jackson v. Allstate Ins. Co.*, 441 F. Supp. 2d 728, 732 (E.D. Pa.

---

[11] We do not present all of Defendant's arguments.

2006). Second, Plaintiff's evidence presented issues of credibility. Allstate *did* have a signed UM rejection form, as poor as the microfiche copy was, so Allstate could rightfully ask the arbitrators not to believe Plaintiff's and her expert's allegations that it was not her signature. In this regard, Plaintiff's assertion that she had not signed the form, aside from the expert's report, was unsupported by any other evidence.[12]

Third, Defendant had its own evidence, evidence not only supporting the genuineness of Plaintiff's signature but also evidence negating Plaintiff's evidence. As noted in its brief, in part, and paraphrased sometimes from Defendant's language, that evidence was as follows:

> 1. Allstate's expert opined that the microfiche copy of the rejection-form signature was too poor to allow an opinion as to its authenticity, a basis for attacking the credibility of Plaintiff's expert.

> 2. Allstate's expert remarked that if one filled in the gaps in the rejection-form signature using as a guide a genuine Plaintiff signature, the resulting signature would "bear a resemblance" to a genuine signature.

> 3. A signature, apparently that of the Plaintiff, appears on four forms executed on August 13, 1990: (a) the application form; (b) the "Rejection of Uninsured Motorist Protection" form; (c) the "Important Notice" form; and (d) the "Notice to Named Insureds" form. Of these forms, Plaintiff conceded that: her signature appeared to be on the application form, although she was not 100 percent sure; her signature was in fact on the

---

[12] Plaintiff's husband's testimony was also unsupported by any other evidence.

"Important Notice" form; and the signature on
the "Notice to Named Insureds" form "looked
like [her] handwriting." The only form she
absolutely denied had her signature was the UM
rejection form.

4. The declaration page issued with the policy
stated: "Uninsured motorist ins. rejected."

5. The "Important Notice" form, the one
Plaintiff admitted she signed, acknowledged
she knew about the available coverages and
which ones she had picked.

6. Plaintiff received declaration pages at
least once every six months for about thirteen
years showing no premium was being charged for
UM coverage.

7. Plaintiff received at least forty-five
notices relating to policy renewals and
amendments that explicitly stated that "You
have rejected uninsured motorist coverage"
without calling Allstate to contradict that
fact.

8. For about twelve years Plaintiff never paid
a premium for UM coverage.

9. Bradley, the counsel Allstate retained to
investigate the claim, believed the Blaylock's
testimony was not credible, that the
handwriting on the rejection form strongly
resembled the other documents Plaintiff
signed, and that he had a reasonable chance to
prevail at the arbitration.

(Doc. 36, Def.'s Supp. Br. at pp. 11-12.)

Fourth, Defendant attacks the opinion of Sallyanne
Donovan, Plaintiff's bad-faith expert, as being insufficient to
either establish a bad faith claim or defeat Defendant's motion
for summary judgment. To begin with, Allstate argus that Donovan
incorrectly assessed the opinion of Defendant's handwriting expert
in asserting that both experts agreed on the "key focus" of the

20

case, that it could not be concluded that the signature was Rita Blaylock's. From this perceived agreement, Donovan found an ambiguity that she believed should have favored coverage for the insured. Allstate points out that its expert actually said that no opinion could be reached about the authenticity of the signature, while Plaintiff's expert thought the opposite, that an opinion could be reached (that the signature was not genuine). Defendant argues that its expert's opinion, far from being consistent with Plaintiff's expert's opinion, actually is against it because, as noted, it undermines the credibility of the expert's opinion, and in a basic way, whether any opinion could have been reached at all about the rejection-form signature. Further, Donovan admitted at her deposition that the arbitrators could have used Allstate's expert to discredit Plaintiff's expert.

Defendant argues Donovan next erred on the law in relying on *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983), to assert that the experts' reports created an ambiguity that had to be resolved in the insured's favor, thereby requiring Allstate to reassess the claim in October 2004 when Defendant had both reports. Defendant contends that *Standard Venetian Blind Co.* spoke about ambiguity in policy language, that any ambiguity in that language had to be resolved in favor of the insured, id. at 305, 469 A.2d at 566, and said nothing about factual disputes between an insurer and insured.

Defendant's third point against Donovan's opinion is that it is erroneously based on just two pieces of evidence: the two notations in Allstate's claim diary by supervisor Edwards. The first notation on September 22, 2003, was advice to the claims representative Rooney: "Defend on no coverage. Let a panel decide." The second notation on November 11, 2003, was again for Rooney: "Panel. Minimal coverage if we lose." Donovan has inferred from these notations alone that because of the relatively small amount of the claim Edwards never made any attempt to evaluate the merits and simply forced Plaintiff to go to arbitration to obtain relief rather than provide coverage as Allstate should have.

In response, Defendant concedes that the amount of the claim factored into the decision to arbitrate but not for the reason of dragging things out, but because, as Edwards testified, it was less costly for both sides and quicker just to arbitrate the claim. Defendant points out that at her deposition Donovan agreed that going to arbitration was favorable to the insured.

Defendant next challenges Donovan's interpretation of Wright's response to the hypothetical question at her deposition asking what Allstate would have done if its expert had said the rejection-form signature was not Rita Blaylock's. Donovan inferred from the response that Allstate would never have changed its decision to deny coverage. Defendant contends that Wright's answer was the opposite, that Allstate was ready to reassess if new or different evidence was presented because Wright clearly answered

22

that she "would have reconsidered [her] decision to arbitrate" if Allstate's expert had said the signature was not Rita Blaylock's.

Finally, Defendant argues that Donovan's opinion does not support bad faith on Allstate's part because, among other reasons, she ignores the reasonable bases Allstate possessed to contest Plaintiff's claim. As listed above, these included the signed forms and its expert's opinion casting doubt on Plaintiff's expert's opinion. In this regard, Defendant notes that Donovan admitted she was not a handwriting expert and hence was not competent to assess a main issue presented in this case, the reasonableness of Allstate's reliance on its handwriting expert to contest coverage.

In opposition, and in support of her own motion for summary judgment, Plaintiff argues as follows, in relevant part. First, Allstate could not rely on the high standard of proof for proving forgery since Plaintiff never claimed forgery, only that the signature was not hers.

Second, this case is about Allstate's ongoing duty to investigate a claim and to continue to reassess it as Allstate received new evidence, and Allstate failed completely to evaluate the claim initially and to reassess it as the claim progressed. In support, Plaintiff argues that Edwards initially made the decision to arbitrate without assessing the merits of the claim simply because of the "small amount" involved, $15.000. She bases this contention on the two diary entries he made in response to

Rooney's inquiries that essentially said to defend on coverage, with the observation that there was minimal coverage (meaning amount of liability) if Defendant lost. Plaintiff contends this initial decision carried all the way through the arbitration, without any evaluation of the Blaylocks' statement under oath or an assessment of both handwriting experts' reports. Plaintiff also relies on Wright's deposition testimony, characterizing it as a decision not to reevaluate or look at new evidence as it came in because the decision had already been made to arbitrate. Plaintiff also points out that Defendant made no attempt to contact the agent who had sold her the policy.

On this second argument, Plaintiff further relies on Allstate's response to two developments: (1) the Blaylocks' denial under oath that it was not Plaintiff's signature on the rejection form; and (2) both expert reports. Plaintiff asserts that the first should have caused Defendant to further investigate and the second should have caused Defendant to reevaluate the case since one expert said it was not Plaintiff's signature and the other said it could not be determined from the microfiche copy if she had written it.

Third, Plaintiff contends there was no evidence or reason to question the insureds' denial that it was her signature. To begin with, Plaintiff never signed the rejection form. Plaintiff also points out that under Allstate's SIU checklist, Defendant did not consider this a case to prosecute as a

fraudulent claim. Additionally, Plaintiff made her claim knowing full well she would be subject to criminal prosecution for perjury if she was lying. Further, Plaintiff's handwriting expert clearly said that it was not Plaintiff's signature but Defendant's expert was questionable because he was able to give an opinion on a signature in the *Jackson* case, *supra*, also involving a poorly copied signature, but could not do so here.

Fourth, Plaintiff relies on her bad-faith expert's analysis of Allstate's handling of the claim. Her expert issued the following opinions concerning Allstate's alleged bad faith, often covering the same points discussed above. To begin with, Allstate made an initial decision to arbitrate and never changed its mind afterwards as evidenced by Allstate's failure to conduct an investigation to verify whether the signature was Rita Blaylock's after Plaintiff's counsel told Allstate in April 2003 that it was not his client's signature on the form. Allstate did nothing and as late as October and November of 2003 was relying on Edwards's decision to go to arbitration and defend on coverage.

Plaintiff's expert next concluded that Allstate could not rely on the insureds' semiannual receipt of Allstate's forms because the law is that a valid signature on the rejection form is required; if there is none, the insurer must provide UM coverage, regardless of the policy provisions.

Her expert's third point was that Allstate acted in bad faith after October 2004 when it had the handwriting reports of

the two experts, and neither expert could conclude that the signature was Rita Blaylock's. When that happened, Allstate should have reassessed the case, in part because the reports created an ambiguity that had to be resolved in the insured's favor. The expert next argued Allstate had no reasonable basis to contest the claim in November 2003 when it did not begin to investigate until January 2004, with the taking of the Blaylocks' statements under oath. The expert also stated Wright's deposition showed that Allstate would not reevaluate the claim once the decision to arbitrate was made because Wright had orders to arbitrate and the Blaylocks could have done nothing to change that. Finally, Donovan noted that Lesnevich, Allstate's handwriting expert, issued a dubious opinion because he was able to decide whether a signature was genuine in the *Jackson* case, 441 F. Supp. 2d 728, but not in this one, even though, as Donovan saw it, both cases presented "visually flawed" signatures.

After review of the parties' briefs and arguments, we agree with Defendant that Plaintiff cannot show by clear and convincing evidence that any reasonable fact finder could find that Defendant acted in bad faith in contesting Plaintiff's UM claim. We will therefore enter summary judgment in favor of Defendant. We reason as follows.

First, we agree with Defendant that it could evaluate whether to contest Plaintiff's claim by reference to the burden of proof for proving forgery. Plaintiff asserts that she never

claimed that the signature was forged, just that the signature was not hers, but when a person claims that a signature is not hers, she is claiming forgery. In any event, her own lawyer referred to her claim as one for forgery. (Doc. 30-16, Pl.'s Ex. O, Rooney Dep., pp. 28-30.)

Second, we agree with Defendant that Plaintiff's claim presented issues of credibility that Defendant could rightfully insist be subject to assessment by a fact finder. In this regard, we reject Plaintiff's reliance on her position that she never signed the rejection form. The issue here is not whether she signed the form. The issue is whether Allstate acted in bad faith in denying her claim, and Allstate *did* have a signed form.

Third, we agree with Defendant that it had evidentiary bases for denying UM coverage; the first three evidentiary items on its list easily represent reasonable bases for doing so. First, while Defendant was faced by the opinion of Plaintiff's handwriting expert that the signature was not Plaintiff's, Defendant had the opinion of its own handwriting expert that the copy of the rejection-form signature was so poor that no opinion could be formed. As Defendant argues, this evidence could be used to attack the credibility of Plaintiff's expert. Further, for what it was worth, Allstate could have presented its expert's observation that the rejection-form signature, "filled in" by using a genuine Plaintiff signature as a guide would "[bear] a resemblance" to a genuine signature.

Moving to the third evidentiary item, we note that what is apparently Plaintiff's signature appears on four forms, all executed on August 13, 1990, the date she applied for insurance. Plaintiff admitted outright signing at least one of the forms, the "Important Notice" form. Further, she conceded that it appeared to be her signature on the application form and also testified that the signature on the "Notice to Named Insureds" form looked like it was in her handwriting. The only form she absolutely denied had her signature on it was the UM rejection form. In these circumstances, it certainly was reasonable for Allstate to argue that the signature was indeed hers, poor as the microfiche copy was, and that her assertion to the contrary, made some twelve years later, and in the wake of an accident with an uninsured driver, was mistaken.

However, the remaining evidentiary items, except the ninth one, would not by themselves be reasonable grounds for refusing the claim.[13] As Defendant itself argues, they all tend to show, especially with the semiannual notices, that Plaintiff knew about UM coverage and that she knew she did not have it. But Defendant still needed a rejection form that complied with the statute, regardless of what the policy said or what Plaintiff knew about its provisions, because the penalty for not having a valid

---

[13] The ninth item, that Allstate's attorney believed the Blaylock's testimony was not credible and that he could prevail at the arbitration, probably would not be a reasonable ground for denying coverage but would disprove bad faith. *See Loos*, *supra*, 476 F. Supp. 2d at 496.

rejection form is reformation of the policy to provide UM coverage. *See Am. Int'l Ins. Co. v. Vaxmonsky*, 916 A.2d 1106, 1110-11 (Pa. Super. 2006) (requiring an insurer to provide UIM coverage when it failed to obtain a valid rejection form in circumstances where the insured would have known he had no UIM coverage and had not been paying premiums for such coverage for about eight years). We suppose, however, that in conjunction with the opinion of Defendant's handwriting expert and the signed forms of August 13, 1990, they are somewhat probative evidence that Plaintiff had signed the rejection form in that her failure over the years to add UM coverage is at least consistent with having signed the form.

Turning to Plaintiff's arguments on summary judgment that there were no reasonable grounds for contesting her claim, we reject them. Plaintiff argues in part there was no reason to challenge her claim because Allstate's SIU checklist did not indicate this was a case to prosecute as a fraudulent claim. Additionally, Plaintiff would have subjected herself to criminal prosecution for perjury if she had lied. We do not consider these sufficient reasons for Allstate to have conceded the claim.

We reject Plaintiff's argument that its bad faith claim is supported by Allstate's failure to investigate after the Blaylocks denied under oath in January 2004 that it was Plaintiff's signature on the rejection form. Perhaps, in other circumstances this would assist a bad faith claim, but here it

does not because a plaintiff in a bad faith claim must show that
the outcome of the case would have been different if the insurer
had done what the insured wanted done. *See Zappile v. AMEX
Assurance Co.*, 928 A.2d 251, 262 (Pa. Super. 2007). Here, the
outcome of the case would not have been different because Allstate
obtained a handwriting expert's opinion that said the signature
was too poor to allow an opinion as to its authenticity. This
opinion also called into question the opinion of Plaintiff's
handwriting expert. Allstate would therefore have contested the
claim in any event, and it is legally irrelevant here that it did
not immediately investigate the signature issue after the January
2004 statements under oath. *See also Kubrick v. Allstate Ins. Co.*,
No. 01-6541, 2004 WL 45489, at *10 (E.D. Pa. Jan. 7, 2004)("harm
is an essential element of a bad faith claim," and when a
plaintiff cannot show harm, the bad faith claim fails).

        We also agree with Defendant that the opinion of
Plaintiff's bad-faith expert, Sallyanne Donovan, is not probative
of bad faith. As we noted above in the background section of this
memorandum, and as basically argued by Plaintiff, Donovan opined
that Allstate had acted in bad faith in the following ways. First,
after Allstate produced the microfiche copy of the rejection form
and Plaintiff's counsel replied in April 2003 that it was not his
client's signature on the form, Allstate should have conducted an
investigation to verify whether the signature was Rita Blaylock's.
Instead, it did nothing and as late as October and November of

30

2003 was relying on Edwards's decision to go to arbitration and defend on coverage. She inferred that Allstate never intended to investigate based on Edwards's notations that Allstate would defend on coverage. She also concluded that Allstate could not rely on the insureds' semiannual receipt of Allstate's forms because the law is that a valid signature on the rejection form is required; if there is none, the insurer must provide UM coverage, regardless of the policy provisions.

Second, she opined that Allstate acted in bad faith after October 2004 when it had the handwriting reports of the two experts. As Donovan reads the reports, both experts agreed on the "key focus" of the case, that it could not be concluded that the signature was Blaylock's. (*Id.*, p. 3.) At this point, Donovan says Allstate should have reassessed the case, in part because the reports created an ambiguity that had to be resolved in the insured's favor under *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983). Instead, it stayed with its position to defend on coverage.

Finally, Donovan opined that Allstate had no reasonable basis to contest the claim in November 2003 when it did not begin to investigate until January 2004, with the taking of the Blaylocks' statements under oath.

We agree with all the attacks Defendant makes on these points. First, Donovan incorrectly assessed the opinion of Defendant's expert in asserting that both experts agreed on the

31

"key focus" of the case, that it could not be concluded that the signature was Rita Blaylock's. Allstate correctly points out that its expert actually said that no opinion could be reached about the authenticity of the signature. Since Plaintiff's expert thought the opposite, that an opinion could be reached (that the signature was not genuine), Defendant argues that its expert's opinion, far from being consistent with Plaintiff's expert's opinion, actually was against it because it undermined the credibility of the expert's opinion in a basic way, whether any opinion could have been reached at all about the rejection-form signature. Further, Donovan admitted at her deposition that the arbitrators could have used Allstate's expert to discredit Plaintiff's expert.

Defendant next correctly argues that Donovan erred on the law in relying on *Standard Venetian Blind Co.* to assert that the experts' reports created an ambiguity that had to be resolved in the insured's favor, thereby requiring Allstate to reassess the claim in October 2004 when Defendant had both reports. Defendant contends that *Standard Venetian Blind Co.* spoke about ambiguity in policy language, that any ambiguity in that language had to be resolved in favor of the insured, id. at 305, 469 A.2d at 566, and said nothing about factual disputes between an insurer and insured.

Third, Defendant correctly maintains that Donovan's opinion that Allstate never made any attempt to evaluate the

merits and simply forced Plaintiff to go to arbitration to obtain relief is erroneous because it is essentially based on just two pieces of evidence: the two notations in Allstate's claim diary by supervisor Edwards made in response to queries from Rooney. As Defendant points out, the amount of the claim factored into the decision to arbitrate but not for the reason of obstructing the claim, but because, as Edwards testified, it was less costly for both sides and quicker just to arbitrate the claim. Defendant points out that at her deposition Donovan agreed that going to arbitration was favorable to the insured, not the company.

Further, contrary to Donovan's opinion, Defendant's assessment of the claim was ongoing. In this regard, Defendant correctly challenges Donovan's interpretation of Wright's response to the hypothetical question at Wright's deposition asking what Allstate would have done if its expert had said the rejection-form signature was not Rita Blaylock's. Donovan inferred from the response that Allstate would never have changed its decision to deny coverage. However, as Defendant contends, Wright's answer was the opposite, that Allstate was ready to reassess if new or different evidence was presented because Wright clearly answered that she "would have reconsidered [her] decision to arbitrate" if Allstate's expert had said the signature was not Rita Blaylock's.

Further, Bradley and Wright testified to their reasons for contesting Plaintiff's claim. Bradley said that after taking the Blaylocks' statements, he had questions about their

credibility since Plaintiff would have been receiving renewal notices for years indicating there was no UM coverage. Additionally, in his view, Plaintiff's expert had credibility problems as well since Allstate's expert said that the signature was too poor to say whether it was Plaintiff's signature. Wright essentially echoed these reasons, saying that she relied on Allstate's expert report indicating that no expert opinion could be given about the genuineness of the signature and also on Plaintiff's never having had UM coverage.

Fourth, Defendant correctly argues, contrary to Donovan, that it had no duty to investigate in April 2003 when Plaintiff's counsel, in response to Allstate's production of the rejection form, stated his client's signature was not the one on the form. We agree with the court in *Jackson*, *supra*, that an insurer should not have the burden of proving that the signature is valid in these circumstances, that is, when the insured presents her mere denial that the signature is hers. As stated by the court there: "To hold that an insurer must be able to prove the validity of a signature in every situation involving § 1731(c), however, would impose an additional technical requirement on the insurer, namely, that of potentially being required to prove that every signature it maintains in its records is not a forgery. The statute simply does not require this." 441 F. Supp. 2d at 733 (footnote omitted).

Plaintiff's expert also asserts that Defendant could not rely on Plaintiff's semiannual receipt of notices from Allstate as

a basis for denying UM coverage. We have already decided above that Allstate had other, adequate bases for resisting the claim, and that the notices provided weak, indirect evidence that the signature was Plaintiff's. We therefore reject this argument.

Plaintiff's expert also contends that Allstate had no reasonable basis to contest the claim in November 2003 when it did not begin to investigate until January 2004, with the taking of the Blaylocks' statements under oath. We reject this argument. Defendant did have a basis to contest the claim, the signed rejection form. Our discussion above concerning the need to show that the outcome of the case would have been different if the insurer had done what the insured said should have been done, *see Zappile*, *supra*, 928 A.2d at 262, also precludes this argument. Even if there was an absence of a reasonable basis in November 2003, Defendant did eventually assemble the evidentiary items listed above.

Plaintiff's expert also maintains that Lesnevich, Allstate's handwriting expert, issued a dubious opinion because he was able to decide whether a signature was genuine in the *Jackson* case, *supra*, 441 F. Supp. 2d 728, but not in this one, even though, as Donovan saw it, both cases presented "visually flawed" signatures. We agree with Defendant, however, when it points out that Donovan is not a handwriting expert and so is not qualified to opine whether Lesnevich correctly analyzed either or both signatures.

The only issue that gives us a brief pause is, as Plaintiff points out, Allstate did not talk to the agent who sold Plaintiff the policy and who would have witnessed if she had signed the rejection form.[14] We do not find this probative enough in this case because we do not know what this potential witness would have said. Plaintiff has the burden of proving her bad faith claim, so she cannot simply assert that Defendant did not contact this witness. She has to show that he would have provided evidence that would have shown that Allstate would have treated her claim differently. *See Zappile*, *supra*, 928 A.2d at 262.

V.   *Conclusion*

Because Plaintiff cannot prove her claim by clear and convincing evidence, we will enter judgment in favor of Defendant and against Plaintiff. There are two other motions outstanding: (1) Defendant's motion for oral argument; and (2) Defendant's motion to preclude the testimony of Sallyanne Donovan. The first motion will be denied since we have been able to decide the cross-motions on the briefs. The second motion will be dismissed as moot since we considered Donovan's testimony on the motions and decided that it was not enough either to preclude summary judgment for Defendant or to grant it for Plaintiff.

---

[14]  As noted, Bradley believes the person was retired or that they could not track him down. He did not pursue that lead very strongly because Plaintiff was not claiming that the agent had signed the policy. Wright could not recall whether she had spoken to the agent or not.

We will issue an appropriate order.


<u>/s/William W. Caldwell</u>
William W. Caldwell
United States District Judge

Date: January 7, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RITA BLAYLOCK and              :
LONNIE BLAYLOCK,
          Plaintiffs           :

                               :
          vs.                        CIVIL NO. 1:CV-06-1456
                               :

                               :
ALLSTATE INSURANCE COMPANY,
          Defendant            :


*O R D E R*

AND NOW, this 7th day of January, 2008, it is ordered
that:

1.  Defendant Allstate's motion (doc. 32)
for summary judgment is granted and
Plaintiff's motion (doc. 29) for summary
judgment is denied.

2.  The Clerk of Court shall enter judgment
in favor of Defendant and against Plaintiff.

3.  Defendant's motion (doc. 48) for oral
argument is denied.

4. Defendant's motion (doc. 31) to preclude
the testimony of Plaintiff's expert, Sallyanne
Donovan, is dismissed as moot.

5. The Clerk of Court shall close this
file.


/s/William W. Caldwell
William W. Caldwell
United States District Judge